UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SCOTT BIENENFELD and
JODI BIENENFELD,

Plaintiff,

- against -

HIDE CHAN RAMEN RESTAURANT,

Defendant.

---------------------------------------------------------------x

12 Civ. 06190 (LAP)

Plaintiffs' Brief in Support of Motion *In Limine*
To Preclude or Limit the Testimony of
Defendant's Medical Experts

## Preliminary Statement

Plaintiffs Scott Bienenfeld, MD and Jodi Bienenfeld respectfully submit the following brief in support of their motion to preclude and/or limit the testimony of defendant's expert doctors Alan Jacobs, MD (endocrinology), Geoffrey Pollack, MD (otolaryngology), Lawrence Attia, MD (gastroenterologist) and Theodore Bania, MD (toxicology).

## Brief Statement of Facts

Briefly stated, this is an action arising out of personal injuries suffered by plaintiff Scott Bienenfeld, MD and a derivative cause of action on behalf of plaintiff-spouse Jodi Bienenfeld. This is an action arising out of injuries suffered by plaintiff Scott Bienenfeld, MD. On Wednesday, August 1, 2012 at 2:40 PM plaintiff Scott Bienenfeld, MD (psychiatrist) was having lunch at the defendant Hide-Chan Ramen restaurant at 248 East 52nd Street in Manhattan. Plaintiff ordered Ramen soup and a club soda. The defendant's employees brought a bowl of hot Ramen soup and a bottle of *Schweppes* club soda containing bleach cleaner. Waitress Eri Yonezawa poured some of the bleach cleaner from the *Schweppes* bottle into a glass and left the bottle and glass on Dr. Bienenfeld's table.

Plaintiff ate some of the hot soup and took two quick gulps from the glass poured by the waitress. After swallowing, Dr. Bienenfeld immediately noticed a very bad taste. Seconds later his throat, mouth and stomach burned intensely and his throat felt like it was closing. The glass and the *Schweppes* bottle contained bleach cleaner. Plaintiff smelled bleach and jumped up from the table. Dr. Bienenfeld ran to the bathroom and attempted to vomit but could not. Dr. Bienenfeld ran back out and demanded to know from the staff what was in the *Schweppes* bottle. The staff could not provide any information and stood staring at him.

In great pain and distress, Dr. Bienenfeld grabbed the *Schweppes* bottle, ran out of the

restaurant and began running down 52nd Street to find a cab to the Emergency Room. As a psychiatrist who works with at-risk youth, Dr. Bienenfeld was aware that drinking bleach is a common method of committing suicide. Dr. Bienenfeld stumbled and choked as he ran through the street thinking he was going to die. Dr. Bienenfeld got a cab to NY Presbyterian Emergency Room.

At the Emergency Room, Scott Bienenfeld's pulse (122) and blood pressure (174/102) were highly elevated. Dr. Bienenfeld was admitted to the hospital. The ER staff told Dr. Bienenfeld that because they were not sure what the substance was or in what concentration, his prognosis included risk of death or severe injury. For 5-6 hours, Scott Bienenfeld felt like he was going to die from being poisoned and continually retched up a foul bleach-smelling substance. During that period the hospital staff told plaintiff there was no "antidote" if he swallowed bleach. Instead, they had to make sure he didn't throw up which could do more damage. All they could do was observe Scott Bienenfeld, ready to intervene should he stop breathing or lose consciousness.

Dr. Bienenfeld underwent an endoscopy the next morning that revealed damage to his esophagus and stomach. Dr. Bienenfeld was discharged on August 2, 2012. Since August 1, 2012, Dr. Bienenfeld has been treated by numerous physicians and has undergone nine endoscopies (gastric, nasopharyngeal and stroboscopy). On September 7, 2012, Dr. Bienenfeld underwent a stomach biopsy which showed "chemical gastropathy" to the lining of his stomach. Dr. Bienenfeld continues to receive medical treatment for the physical and psychological damage caused by the August 1, 2012 accident.

On August 3, 2012, two of the defendant's employees (manager Takumi Ito and bartender/waitress waitress Chiyo Yamauchi) gave statements to the investigating officer from the NYC Department of Health and Mental Hygiene who generated an Inspection Report. In the

Description of Findings section of the Department of Health Report, it states as follows:

> RE: food poisoning investigation
>
> The NYC Dept of Health, Environmental investigation visited the above address to conduct a limited inspection involving one person who purchased *Schweppes* club soda and consumed it resulting in burns of the throat and stomach subsequently hospitalized (overnight).
>
> Mr. Takumi Ito, manager and Ms. Chiyo Yamauchi bartender/waitress were notified of investigation visit and the following information was gathered. Ms. Yamauchi stated that she poured bleach into an empty *Schweppes* bottle to wash mop in bar area. The bottle with bleach was accidentally left on counter and was used by another waiter Eri Yonezawa the next day (served to a customer).
>
> Sanitary Inspection of the establishment revealed that all bleach containers were stored on shelf at rear of kitchen. No bleach noted in bar area and other areas of kitchen. You are advised by NYC Dept of Health to have a special bottle and labeled the word bleach to avoid mistakes.

The deposition testimony of defendant restaurant manager Takumi Ito admitting Scott Bienenfeld was served bleach instead of club soda:

> Q: Was he [plaintiff Scott Bienenfeld] served two percent bleach at the restaurant?
>
> A: Yes.
>
> * * *
>
> Q: Did Chiyo Yamauchi [waitress] put two percent bleach into the bottle that was served to Dr. Bienenfeld?
>
> A: Yes.
>
> * * *
>
> Q: [Reading from NYC Department of Health Report] "Ms. Yamauchi stated that she poured bleach into an empty Schweppes bottle to wash and mop in the bar area." Is that accurate?
>
> A: Yes.
>
> Q: Now, did Ms. Yamauchi say that or did you say that?
>
> A: I heard from Ms. Yamauchi and, at the time of the inspection, I said it.

Q: Continuing on with the report, "The bottle with bleach was accidentally left on the counter and was used by another waiter, Eri Yonezawa, the next day and served to a customer." Is that accurate?

A: I don't know whether it was in the refrigerator or not, but it was served, but the one who served it was Eri.

Q: When you say "it," do you mean the bottle with bleach?

A: That's right.

Q: What did you do with the glass? The bleach substance that was served to Dr. Bienenfeld, did you throw it away or keep it or something else?

A: At that time, I kept it and then, after the inspection was completed, I threw it away.

Takumi Ito deposition, pp. 24, 38, 47-48, Exhibit F to the Kelly Affidavit.

Defendant's employee chef Masaki Watanabe testified at deposition that he tasted a small amount of the contents of the glass served to Dr. Bienenfeld, the liquid burned his mouth, he spit it out immediately and gargled. The deposition testimony of defendant restaurant chef Masaki Watanabe admitting plaintiff was served bleach instead of club soda:

Q: Okay. Now, earlier you said that you tasted what the customer had drank; is that accurate? (p. 25)

A: Yeah.

* * *

Q: Okay. And did you swallow what was in that glass? (p. 27)

A: No. I spit it out.

Q: Okay. what did it taste like?

A: It was like a burning.

Q: Okay. And where did you feel the burning that you described? (p. 28)

A: Inside of my mouth.

Q: Okay. And after you tasted it and felt the burning in your mouth, what, if anything, did you do next?

A: I gargled.

Q: Okay. What did you gargle with?

A: I did gargle because I felt that, something weird inside – bad inside of my mouth.

Masaki Watanabe deposition, pp. 25, 27 and 28.

Mr. Watanabe testified that Dr. Bienenfeld returned to the restaurant 2 days after the accident. At that time, Mr. Watanabe apologized to Dr. Bienenfeld for the accident, showed him 2 bottles of bleach cleaning solution and testified that it was his impression that a waitress put the bleach into a *Schweppes* bottle that was served to plaintiff Scott Bienenfeld.

Q: I believe you said you spoke with Dr. Bienenfeld; is that right? (p. 40)

A: Yes.

Q: Okay. What did you say to him? What did he say to you?

A: I—basically I apol—first of all, I apologized for the fact that happened. I told him that we will cover for any medical treatment on the area where he had a problem—he had a problem.

* * *

Q: Okay. Anything else?

A: And he told me—I do recall that he said that I thought—quote, I thought somebody would kill me and--

Q: Who said that?

A: The victim, meaning Bienenfeld.

* * *

Q: Just so I understand, you showed Dr. Bienenfeld the bottles that were accessible to the servers; is that right? (p. 55-57)

A: Yes. And that's everything, what we had—we—at the time—that's the ones we had as inventory at the time in the restaurant.

Q: Right. And is it your impression that one of the servers accessed these bottles when Dr. Bienenfeld was being served?

A: Yes, they had.

* * *

A: My opinion was that because it was already in his glass -- so my opinion was that somebody had put this cleaning material to put in a glass in order to clean up someplace. That was my opinion.

Q: And the cleaning material you're referring to is what's shown in Plaintiff's Exhibit A? [photo of 101 Bleach bottle]

A: Yeah, probably so. Maybe somebody put it.

Q: Okay. And when you say “somebody,” do you mean someone who worked at the restaurant?

A: Yes.

Q: Okay. So your understanding is that Chiyo Yamauchi filled a bottle with some substance and that substance was served to Dr. Bienenfeld unintentionally? (p. 61)

A: Without knowing it, unintentionally. I don't know really.

Q: I’m asking is that your impression?

A: Yes.

Masaki Watanabe deposition, pp. 40, 55-57 and 61.

Mr. Ito further testified at deposition (pp. 35-37, 42) that bartender Chiyo Yamauchi put bleach in the bottle and waitress Eri Yonezawa served the bleach to plaintiff were both fired and returned to Japan. Mr. Ito later recanted his deposition testimony indicating that Eri Yonezawa wasn’t fired. Mr. Watanabe testified at deposition that Eri Yonezawa was fired (p. 37, lines 11-12).

On March 4, 2014, plaintiff’s expert forensic chemist John Simpson, PhD tested the liquid that Dr. Bienenfeld drank on August 1, 2012 and concluded that the liquid was 4.95% sodium hypochlorite (bleach).

It is uncontested, even according the sworn deposition testimony of defendant's employees, that on August 1, 2012 the defendant restaurant served and plaintiff Scott Bienenfeld drank 4.95% sodium hypochlorite (bleach).

Argument in Support

The Court should preclude the trial testimony of each of defendant's medical experts because nearly all of the conclusions in all of the reports are not within a reasonable degree of medical certainty. In the case of defense endocrinologist Alan Jacobs, defendant's counsel failed to comply with FRCP Rule 26(a)(2) and Dr. Jacobs offers opinions on subjects that he is not qualified to render opinions on such as post traumatic stress disorder (PTSD) and the personal credibility of Scott Bienenfeld, MD and Jodi Bienenfeld. Dr. Jacobs should be precluded from offering any testimony for three reasons. First, his opinions are not within a reasonable degree of medical certainty. Second, defense counsel failed to comply with FRCP Rule 26(a)(2). Third, Jacobs' opinions on PTSD, the credibility of the plaintiffs and the credibility of the treating physicians are unsolicited, unwarranted and unqualified. FRE Rule 403 of the Federal Rules of Evidence states that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We will move against each defense medical expert in turn.

Defense Endocrinologist Alan Jacobs, MD

Dr. Jacobs' 17 page report dated January 18, 2014 (Exhibit A) amounts to little more than disparaging personal attacks on the credibility of plaintiffs, the treating physicians and plaintiffs' counsel. In addition, Alan Jacobs (an endocrinologist) offers many opinions regarding post traumatic stress (causes, symptoms, effects, etc.). Scott Bienenfeld, MD and Jodi Bienenfeld, people he's never met ("angered by being served bleach on the rocks," p. 3 "this is so obviously

a fraud," p. 7 "I believe this is a con job," p. 8), personal attacks on Dr. Bienenfeld's treating physicians ("Dr. Samberg is either naïve or being duped by Dr. Bienenfeld", p. 10, "Dr. Reisacher is thinking in an incompetent manner...is beginning to sound absurd," p. 15 "Dr. Charney enters four diagnoses...two of which are not true, one of which is exaggerated…she diagnoses him with the mysterious hoarseness that only she can perceive" p. 9). Dr. Jacobs bases his remarks in part upon his review of 2 inadmissible settlement letters authored by your undersigned ("settlement letter written by William Kelly is wildly over-verbose" p. 8).

In addition, Dr. Jacobs devotes a substantial amount of his report to areas beyond his expertise—psychiatry and the causes of post traumatic stress disorder ("Fear, distress and suffering are very different from anger. People don't develop PTSD from intense anger." p. 14). Finally, none of Dr. Jacobs conclusions are expressed "within a reasonable degree of medical certainty" as required by New York law. In addition, New York law requires a physician's statement be "affirmed…to be true under the penalties of perjury" (*see Offman v Singh*, 27 AD3d 284 [1st Dept 2006]; *Gilphilin v Hanson*, 205 AD2d 353[19940; *McLayrd v Pennypacker*, 178 AD2d 227 [1991], *lv denied* 79 NY2d 754 [1992]; *Tattegrain v New York Transit Authority*, 2002 NY Slip Op 40296[U] [App Term, 2d Dept 2002] [affirmation in which doctor affirmed "to the best of my knowledge the statements contained in this report are true" insufficient to satisfy CPLR 2106]). Dr. Jacobs' "report" is just a 17 page recitation of Scott Bienenfeld's medical records with Dr. Jacobs' personal ramblings about any number of different topics. This is not an expert's report. Dr. Jacobs should not be permitted to testify regarding any of the topics covered in this far afield commentary.

In addition, defendant's counsel failed to comply with FRCP Rule 26(a)(2) in that the expert disclosure relative to Dr. Jacobs did not include a list of all cases in which Dr. Jacobs served as an expert during the last 4 years.

Dr. Jacobs's testimony should be precluded as the medical opinions in his report are not within a reasonable degree of medical certainty, not sworn to be true, many are not medical opinions at all but angry personal commentary, not in compliance with FRCP Rule 26(a)(2) and amount to nothing more than a patchwork quilt of disparaging personal attacks and insults instead of reasoned medical conclusions. Accordingly, plaintiffs' motion *in limine* to preclude and/or substantially limit the testimony of defendant's medical expert Alan Jacobs, MD should be granted in all respects.

Defense Otolaryngologist Geoffrey Pollack, MD

Dr. Pollack's undated report, undated first addendum and undated second addendum (Exhibit B) indicate a defense examination was conducted on November 29, 2012. In all 3 of Dr. Pollack's reports, only one medical opinion is expressed "within a reasonable degree of medical certainty" as required by New York law (p. 3 of the original undated report states "the injury then that was seen on my exam within a reasonable degree of medical certainty is the result of acid reflux disease."). In addition, New York law requires that physician's statement to be "affirmed…to be true under the penalties of perjury" (*see Offman v Singh*, 27 AD3d 284 [1st Dept 2006]; *Gilphilin v Hanson*, 205 AD2d 353[19940; *McLayrd v Pennypacker*, 178 AD2d 227 [1991], *lv denied* 79 NY2d 754 [1992]; *Tattegrain v New York Transit Authority*, 2002 NY Slip Op 40296[U] [App Term, 2d Dept 2002] [affirmation in which doctor affirmed "to the best of my knowledge the statements contained in this report are true" insufficient to satisfy CPLR 2106]).

Dr. Pollack's testimony should be precluded as only one of the medical opinions expressed in his report is offered within a reasonable degree of medical certainty and none are sworn to be true. If Dr. Pollack is permitted to testify he should be limited to the single opinion that is stated to be within a reasonable degree of medical certainty. Accordingly, plaintiffs'

motion *in limine* to preclude and/or substantially limit the testimony of defendant's medical expert Geoffrey Pollack, MD only to the one opinion offered within a reasonable degree of medical certainty, should be granted in all respects.

Defense Gastroenterologist Lawrence Attia, MD

In Dr. Attia's report, dated December 31, 2012 (Exhibit C) none of his medical opinions are expressed "within a reasonable degree of medical certainty" as required by New York law. Dr. Attia states "my opinions on this matter are based on my medical knowledge and my 17 years experience…" This is not a legal standard for a medical expert opinion under New York law. New York law requires a physician's statement to be "affirmed…to be true under the penalties of perjury" (*see Offman v Singh*, 27 AD3d 284 [1st Dept 2006]; *Gilphilin v Hanson*, 205 AD2d 353[19940; *McLayrd v Pennypacker*, 178 AD2d 227 [1991], *lv denied* 79 NY2d 754 [1992]; *Tattegrain v New York Transit Authority*, 2002 NY Slip Op 40296[U] [App Term, 2d Dept 2002] [affirmation in which doctor affirmed "to the best of my knowledge the statements contained in this report are true" insufficient to satisfy CPLR 2106]). In addition, Dr. Attia admits on p. 2 of his report that he never reviewed the emergency room records or the pathology from the initial upper endoscopy on August 2, 2014 ("it would have been interesting to see pathology from the initial upper endoscopy on August 2nd on the noted chronically inflamed stomach"). So, the foundation for any expert opinion by Dr. Attia is missing.

Dr. Attia's testimony should be precluded as none of the medical opinions expressed in his report is offered within a reasonable degree of medical certainty and none are sworn to be true. If Dr. Attia is permitted to testify he should be limited to only those records he reviewed. That is, Dr. Attia should be precluded from testifying about anything in the emergency room records or that occurred in the emergency room and/or any matters relating to the pathology of the August 2, 2012 endoscopy. Accordingly, plaintiffs' motion *in limine* to preclude and/or

substantially limit the testimony of defendant's medical expert Lawrence Attia, MD should be granted in all respects.

Defense Toxicologist Theodore Bania, MD

In Dr. Bania's report, dated February 5, 2013 (Exhibit D) none of his medical opinions are expressed "within a reasonable degree of medical certainty" as required by New York law. Dr. Bania on p. 2 states only "in my medical opinion the patient had an unintentional ingestion of dilute bleach liquid." This is not a legal standard for a medical expert opinion under New York law. New York law requires a physician's statement to be "affirmed…to be true under the penalties of perjury" (*see Offman v Singh*, 27 AD3d 284 [1st Dept 2006]; *Gilphilin v Hanson*, 205 AD2d 353[19940; *McLayrd v Pennypacker*, 178 AD2d 227 [1991], *lv denied* 79 NY2d 754 [1992]; *Tattegrain v New York Transit Authority*, 2002 NY Slip Op 40296[U] [App Term, 2d Dept 2002] [affirmation in which doctor affirmed "to the best of my knowledge the statements contained in this report are true" insufficient to satisfy CPLR 2106]).

Dr. Bania's testimony should be precluded as none of the medical opinions expressed in his report is offered within a reasonable degree of medical certainty and none are sworn to be true. Dr. Bania discusses the level of bleach concentration in the cleaning product Bleach 101 but provides no foundation for his opinion. Dr. Bania never examined any of the liquid that plaintiff drank. Dr. Bania's report lists those items he reviewed in preparing his opinion and report. Dr. Bania never analyzed the Bleach 101 product or even looked at a Bleach 101 label. Defense counsel affirmatively refused to test the remaining liquid in the bottle that defendant served to plaintiff. Plaintiffs even offered to work together with defense counsel to jointly choose a lab to test the liquid. Defense rejected this offer as well. The Court also offered defense counsel the opportunity to test the liquid. Defense counsel refused again. Accordingly, the defendant is precluded from offering any expert opinions regarding the level of bleach

(sodium hypochlorite) present in the liquid served to Dr. Bienenfeld on August 1, 2012. Such opinions by defendant's toxicologist are completely speculative. The reason they are speculative is that defense counsel refused every opportunity to test the liquid.

Only plaintiff's expert forensic chemist John Simpson, PhD (Exhibit E) tested the liquid served to Dr. Bienenfeld and concluded the liquid was 4.95% bleach and had a pH of 12.02. The lab results from plaintiffs' expert forensic chemist John Simpson, PhD conclude the liquid was 4.95% bleach ("The concentration of hypochlorite in the solution sample, assuming all observed chloride and chlorate are the decomposition products of hypochlorite, is 4.95% by weight."). The lab report was served on defendant on September 25, 2013. Dr. Simpson's supplemental report dated and served March 4, 2014 (Exhibit E) concluded the pH of the liquid was 12.02 ("the measured pH of the sample was 12.02.").

Plaintiffs and the Court offered to provide the liquid to defendant for testing several times. Defense counsel refused each time. So, defendant waived its right to conduct scientific testing of the liquid and is now precluded from testing the liquid. As defendant refused to test the liquid, defendant and defendant's experts should be precluded from offering evidence at trial regarding the properties of the liquid (i.e., pH level, percentage of bleach by weight, etc.).

Moreover, Dr. Bania's unsworn report, discusses diagnosis and prognosis. This testimony would be duplicative and outside the scope of Dr. Bania's area of expertise as a toxicologist. Dr. Bania has never met or examined Scott Bienenfeld, MD and knows nothing about the diagnosis or prognosis of Scott Bienenfeld's injuries outside of reading the medical records and 2 inadmissible settlement letters written by your undersigned provided to him by defense counsel.

Dr. Bania should be precluded from testifying about the percentage of bleach (sodium hypochlorite) present in the liquid that Scott Bienenfeld drank on August 1, 2012. If Dr. Bania is

permitted to testify he should be limited to matters of toxicology only with a scientific foundation. Dr. Bania should be precluded from testifying about any matters relating to diagnosis of injury or prognosis for recovery. Accordingly, plaintiffs' motion *in limine* to preclude and/or substantially limit the testimony of defense toxicology medical expert Theodore Bania, MD should be granted in all respects.

Conclusion

Based on the foregoing arguments plaintiffs respectfully request that the Court grant its motion *in limine* to preclude and/or substantially limit the testimony of defendant's medical experts Alan Jacobs, MD, Geoffrey Pollack, MD, Lawrence Attia, MD and Theodore Bania, MD.

Dated: New York, NY
June 30, 2014

Respectfully submitted,

McCarthy & Kelly LLP
Attorneys for Plaintiffs

By________________________
William P. Kelly (WK 4641)
A Member of the Firm
52 Duane Street
New York, NY 10007
(212) 732-5040

TO: Law Office Todd McCauley
Attorneys for Defendant
274 Madison Avenue
New York, NY 10016
(212) 679-3124

Affidavit of Service

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

William P. Kelly, being first duly sworn, deposes and says that:

1. I am not a party to this action, am over 18 years of age and reside at 15 Broad Street, New York, NY 10005.

2. On June 30, 2014, I served the within motion *in limine* with Exhibits by United States Postal delivery addressed to:

Law Office Todd McCauley
274 Madison Avenue
New York, NY 10016

the address designated for service, by depositing same, enclosed in a properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Post Office within the State of New York.

William P. Kelly

Sworn to before me this
day of June 30, 2014

Notary Public

GERALD T. McCARTHY
Notary Public, State of New York
No. 02MC5066071
Qualified in New York County
Commission Expires Sept. 23, 2014